1  **MILSTEIN ADELMAN, LLP**
   Mark A. Milstein, State Bar No.
2  2800 Donald Douglas Loop North
   Santa Monica, California 90405
3  Telephone: (310) 396-9600
   Fax: (310) 396-9635
4
   **FLAHERTY HENNESSY, LLP**
5  Sarah L. Gough, State Bar No. 247220
   8055 West Manchester Street, Suite 420
6  Playa del Rey, California 90293
   Telephone: (310) 305-1280
7  Fax: (310) 305-1210
8  **ZEBERSKY PAYNE, LLP**
   110 Southeast 6th Street, Suite 2150
9  Fort Lauderdale, Florida 33301
   Telephone: (954) 989-6333
10 Fax: (954) 989-7781
11 Attorneys for Plaintiff Wesley Leung

12

13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15                    **WESTERN DIVISION**

16

17 | WESLEY LEUNG individually and on behalf of all others similarly situated, | CASE NO.: 5:15-cv-00835-FMO-JCx

18

19                        Plaintiff,          PLAINTIFF'S OPPOSITION TO
         vs.                                  MOTION TO COMPEL ARBITRATION;
20                                            MEMORANDUM OF POINTS AND
   FANDUEL, INC., a Delaware                  AUTHORITIES IN SUPPORT THEREOF
   Corporation
21
                          Defendant.
22                                            Date:        July 2, 2015
                                              Time:        10:30 a.m.
23                                            Courtroom:   22
                                              Judge:       Hon. Fernando Olguin
24

25 ///

26 ///

27 ///

28 ///

                                       1

# TABLE OF CONTENTS

MEMORANDUM IN SUPPORT OF OPPOSITION ..................................................2

I.   PRELIMINARY STATEMENT ...............................................................................2

II.  FACTUAL BACKGROUND.....................................................................................3

    A.   Facts of the Case ............................................................................................3

    B.   On-line Transaction .......................................................................................3

III. LEGAL ARGUMENT...............................................................................................4

    A.   The Arbitration Clause and Class Action Waiver are Not Valid.................4

        1. Choice of Law ...........................................................................................4

        2. Legal Standard for Creation of Binding Internet Contracts Containing
           Arbitration Clauses....................................................................................5

        3. The Plaintiff is Not Bound by the Terms of Use on the FanDuel Website........6

           a.   Enforcement of Valid Browsewrap Agreement...............................6

              a.   The Design and Content of the Fanduel Website do Not
                   Create Assent to the Terms of Use ......................................8
              b.   The Cases Relied Upon by the
                   Defendant are Inapposite .................................................10

    B.   FanDuel Should Not be Able to Benefit Through its Deceit and Small Print..........11

IV. CONCLUSION.........................................................................................................13

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

i

1

**<u>TABLE OF AUTHORITIES</u>**

2

**<u>STATE CASES</u>**

3

*AT&T Technologies, Inc. v. Communications Workers of America*
475 U.S. 643, 648 (1986)...............................................................................5

*Berkson v. Gogo LLC,*
No. 14-CV-1199, 2015 WL 1600755, at *34
(E.D.N.Y. Apr. 9, 2015) ...............................................................................7

*Berkson v. Gogo LLC,*
No. 14-CV-1199, 2015 WL 1600755, at *3
(E.D.N.Y. Apr. 9, 2015) ..............................................................................10

*BG Grp., PLC v. Republic of Argentina,*
134 S. Ct. 1198, 1206 (2014)........................................................................5

*Bonnant v. Merril Lych, Pierce, Fenner & Smith, Inc.,*
467 F. App'x 4, 6-7 (2d Cir. 2012)   .............................................................5

*Crawford v. Beachbody, LLC,*
No. 14 CV 1583-GPC KSC, 2014 WL 6606563, at *3
(S.D. Cal. Nov. 5, 2014) ..............................................................................10

*Friedman v. Guthy-Renker LLC,*
No. 2:14-CV-06009-ODW, 2015 WL 857800, at *5
(C.D. Cal. Feb. 27, 2015).............................................................................7

*Fteja v. Facebook,*
841 F.Supp.2d 829 (S.D.N.Y 2012).........................................................9, 10

*Gonzalez v. Preferred Freezer SErvs., LBF, LLC,*
NO. CV-12-3467 ODW FMO, 2012 WL 2602653, at *2
(C.D. Cal. July 5, 2012)...............................................................................5

*Hines v. Overstock.com, Inc.,*
380 F. App'x 22, 24 (2d Cir. 2010) .............................................................5

*JLM Indus., Inc. v. Stolt-Nielsen SA,*
387 F.3d 163, 169 (2d Cir. 2004)................................................................5

*JLM Indus., Inc.*, 387 F.3d at 171 (quoting *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.,*
489 U.S. 468, 479 (1989)) ...........................................................................5

4

5

6

7

8

9

10

11

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

*Nguyen v. Barnes & Noble, Inc.*,
763 F.3d 1171 (9th Cir. 2014) ..................................................................6

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014)
(quoting *Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17, 29 (2d. Cir. 2002)). ............................................................2

*Nguyen v. Barnes & Noble, Inc.*,
No. 8:12-CV-0812-JST RNB, 2012 WL 3711081, at *3
(C.D. Cal. Aug. 28, 2012) aff'd 763 F.3d 1171 (9th Cir. 2014). ..................4

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110, 118, 126-27 (2d Cir. 2012)..................................................5

*Sgouros v. TransUnion Corp.*,
No. 14 C 1850, 2015 WL 507584, at *7
(N.D. Ill. Feb. 5, 2015) ............................................................................8

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17, 29 (2d. Cir. 2002)). ............................................................8

*Specht v. Netscape Commc'ns Corp.*
205 F.3d 17, 28 (2d Cir. 2002) ................................................................5

*Stark v. Gilt Group, Inc.*,
No. 13 Civ. 5497 LLS, 2014 WL 1652225
(S.D.N.Y. Apr. 24, 2014)........................................................................10

**FEDERAL STATUTES**

The Federal Arbitration Act, 9 U.S.C. § 1 ..................................................5

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

## MEMORANDUM IN SUPPORT OF OPPOSITION

Plaintiff Wesley Leung ("Leung") respectfully submits this memorandum of law in support of it opposition to Defendant FanDuel, Inc.'s ("FanDuel") motion to compel arbitration.

## PRELIMINARY STATEMENT

This case is about a deceitful marketing campaign used by the Defendant, FanDuel, to entice people to utilize the Defendant's product.  In essence, FanDuel, a fantasy sports game, promised people that it would match them "dollar for dollar" for initial deposits on its website.  The deposits were then used to participate in fantasy sports games where the participant could win money if it picked better players than their opponents.  While this sounds like gambling, FanDuel, is able to operate by claiming that it is a game of skill.

What FanDuel, did not tell folks in its marketing campaign, is that FanDuel never had any intention of matching users of its fantasy sports game dollar for dollar. Instead, FanDuel always intended on utilizing boilerplate language in its adhesion-like Terms of Use which was never specifically shown by FanDuel to the Plaintiff and was never assented to by the Plaintiff to only match $0.04 for each deposit dollar; so for a person that put down an initial $20.00 deposit, they will have to play $500.00 worth of games to obtain their $20.00 match.

In further example of indignation, FanDuel is now trying to use the same boilerplate adhesion-like Terms of Use to send this case to arbitration and to eliminate this case from being brought as a class action.  However, the Terms of Use are not binding on the Plaintiff and the class because "[m]utual manifestation of assent, whether by written or spoken word or by conduct…" are lacking. *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 29 (2d. Cir. 2002)).

///

///

# FACTUAL BACKGROUND

## I.    Facts of the Case

For several years, FanDuel has advertised and continues to advertise a "dollar for dollar" match for an initial deposit up to $200 on its website.  In October 2013, Mr. Leung was enticed by this offer and signed up for FanDuel with an initial deposit of $100.  (Decl. ¶ 3.)  Based on FanDuel's advertising, Mr. Leung believed that he would immediately receive an additional $100 match in his account.  This was not the case.

At issue is FanDuel's website, which appears to have been intentionally designed to hide the Terms of Use from Mr. Leung and the class members he seeks to represent in this case.  Specifically, while it is common for internet merchants to require consumers to "click" their affirmative assent to applicable terms and conditions to sign up (and certainly FanDuel could have easily done so here), FanDuel instead chose to eliminate this step for consumers.  Making it as easy as possible for consumers to sign up, FanDuel never informed Mr. Leung or any other consumers that the Terms of Use setting forth the actual policy for the "dollar for dollar" matching scheme (let alone the arbitration clause buried therein) existed and applied to his use of the FanDuel site.  FanDuel certainly never required, or even suggested, that Mr. Leung or any other consumer should review the Terms of Use.  (Decl. ¶ 9-13.)

In fact, it is undisputed that Mr. Leung did not click on or affirmatively agree to FanDuel's Terms of Use, nor did he have any reason to do so.  FanDuel's Terms of Use hyperlink was inconspicuous and confusing, among other reason because it was not set apart in color or location that would encourage a consumer to hyperlink.

## II.    On-line Transaction

FanDuel's design and content for its website is as follows:

1. The home page contains a green banner on the right side of the screen in large font stating: "JOIN NOW".  (Declaration of Wesley Leung in Support of Plaintiff's Opposition to FanDuel's Motion to Compel Arbitration ("Decl.") at ¶ 6, Ex. A.  Near the very bottom of the home page, and in tiny font are the words "Terms of Use".

3

(Decl. ¶ 7.)  This link is etched in between a disclaimer and the "privacy policy" and in order to see this language, one has to scroll down on the active home page.

2. After clicking the large green button, the user is taken to a pop-up box that is superimposed on the home page.  (Decl. ¶ 8.)  The pop-up box is about 1/3 of the active screen and has a grey background with several horizontal entry spaces in white for entry of a user's name, email address, username and password.  At the top of the pop-up box is the title "Play Now" which is in extremely large font and is almost black in color.

3. The request for entry of information is about 2/3 of the pop-up box and right below the entry of the information is the banner button with a green background. Inside the banner button is the term: "Play Now" which is in very large font and is in white, which contrasts with the green.

4. Then below the "Play Now" button is the phrase "Got a Promo code or referral username?"  This request is in contrasting blue color.  When clicked, another information box appears asking a user to input certain information;

5. After the promo code information, in grey lettering that fades into the backdrop is the phrase and in the smallest font on the page: "By signing up, you confirm that you are at least 18 years of age and agree to the Terms of Use."

6. The only way for a person to proceed further into playing FanDuel is to click on the "Play Now" button.  A user is then brought to different screens that do not make any mention of the terms of use.

## ARGUMENT

I.   **The Arbitration Clause and Class Action Waiver are Not Valid**

a.  **Choice of Law**

As an initial issue the Defendant has asserted that based on the boilerplate adhesion-like Terms of Use located in the corners of its website, the Plaintiff has agreed to New York law.  To the contrary, as asserted throughout this Memorandum, it is the Plaintiff's position that the Terms of Use do not apply to this case.  However,

4

1   "[t]he Court need not resolve this "chicken and egg" question.  While the choice of law
2   issue may have significance later in the litigation, the question of Plaintiff's assent to
3   the Terms of Use, and, consequently, the validity of the arbitration provision, does not
4   hinge on whether New York and California law applies" because there is no
5   fundamental difference between New York and California law.  *Nguyen v. Barnes &*
6   *Noble, Inc.,* No. 8:12-CV-0812-JST RNB, 2012 WL 3711081, at *3 (C.D. Cal. Aug.
7   28, 2012) aff'd 763 F.3d 1171 (9th Cir. 2014).

8
    **b. Legal Standard for Creation of Binding Internet Contracts**
9   **Containing Arbitration Clauses**

10      The Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (the "FAA"), first enacted
11  in 1925, "places arbitration agreements upon the same footing as other contracts."
12  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118, 126-27 (2d Cir. 2012) (internal
13  citation and quotation marks omitted.)  The FAA "does not require parties to arbitrate
14  when they have not agreed to do so."  As the United States Supreme Court made clear
15  in *AT&T Technologies, Inc. v. Communications Workers of America*, "arbitration is a
16  matter of contract and a party cannot be required to submit to arbitration any dispute he
17  has not agreed so to submit."  475 U.S. 643, 648 (1986) (internal citation and quotation
18  marks omitted).  *See also BG Grp., PLC v. Republic of Argentina*, 134 S. Ct. 1198,
19  1206 (2014); *Bonnant v. Merril Lych, Pierce, Fenner & Smith, Inc.*, 467 F. App'x 4, 6-
20  7 (2d Cir. 2012).  "The threshold question facing any court considering a motion to
21  compel arbitration is therefore whether the parties have indeed agreed to arbitrate."  *Id,*
22  *see also JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004).
23  Arbitration "is 'a matter of consent, not coercion.'"  *JLM Indus., Inc.*, 387 F.3d at 171
24  (quoting *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*,
25  489 U.S. 468, 479 (1989)).

26      Additionally, contracts formed over the internet still require the parties to
27  manifest their assent to the terms between the parties.  *Specht v. Netscape Commc'ns*
28  *Corp.*  205 F.3d 17, 28 (2d Cir. 2002).  Importantly, FanDuel has the burden of

1  demonstrating that the Plaintiff assented to the contract terms.   *Hines v.*
2  *Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010); *see also Gonzalez v.*
3  *Preferred Freezer SErvs., LBF, LLC*, NO. CV-12-3467 ODW FMO, 2012 WL
4  2602653, at *2 (C.D. Cal. July 5, 2012).  FanDuel has not met their burden.

5
6

### c. The Plaintiff is Not Bound by the Terms of Use on the FanDuel Website

7  In the world of internet commerce there are two general types of agreements that
8  attempt to bind internet users to the terms of use for a given website; clickwraps and
9  browsewraps.  A "clickwrap" agreement is where a user is presented with the actual
10  terms of use on an active page usually using a scroll screen.  At the end of the scroll
11  screen the person is asked to click a box that they "read" and "agree" to the terms and
12  then the person is required to click another button to continue using the website.  One
13  cannot continue using the website unless the user both clicks that they read and agreed
14  to the terms and then clicks another button to continue.  When the person clicks the box
15  and the button a contract is formed.

16  "Browsewraps" do not require any affirmative conduct by the user
17  acknowledging that they have read and agree to the terms of use; clicking on a box
18  indicating that they have read and agree to the terms of use.  Instead, websites with
19  browsewrap agreements use more passive conduct to attempt to establish an
20  agreement.

21  The website in this matter is an ill-fated attempt to use a browsewrap agreement
22  to manifest assent to the Terms of Use.

### i. Enforcement of Valid Browsewrap Agreement

24  Enforcement of browsewrap agreements, under both New York and California
25  law, are not favored by courts in consumer transactions.  *Nguyen v. Barnes & Noble,*
26  *Inc.*, 763 F.3d 1171 (9th Cir. 2014).  Accordingly, "the onus must be on website owners
27  to put users on notice of the terms to which they wish to bind consumers." *Id.* at 1179.
28  The *Nguyen* court held that the Terms of Use on a website using a browsewrap

6

is only binding on a consumer when: (a) the consumer had actual notice of the agreement[1] or (b) the design and content of the website and the agreement's webpage put a user on notice of the binding nature of the terms of use and the website requires an affirmative act to demonstrate assent. *Id. See also Friedman v. Guthy-Renker LLC*, No. 2:14-CV-06009-ODW, 2015 WL 857800, at *5 (C.D. Cal. Feb. 27, 2015) (manifestation of intent to be bound not found by a website that required consumer to click button stating "Agree to terms" when the terms of use were not directly related to the Terms of Use.).

A New York court in *Berkson v. Gogo LLC*, No. 14-CV-1199, 2015 WL 1600755, at *34 (E.D.N.Y. Apr. 9, 2015) did an exhaustive and complete analysis of the use of browsewraps and the types of websites that manifest the requisite assent by a consumer to be bound by the Terms of Use. The website in *Berkson*, consisted of two separate screens[2] that contained language attempting to bind a consumer to an internet agreement. The first screen contained the language that "By clicking 'Sign In' I agree to the *terms of use* and *privacy policy*". Right below this language is a button in larger font with a backdrop in contrasting color with the words "SIGN IN". And the second screen contained language: "By clicking the "NEXT" button on the account creation page the user was assenting to the company's "terms of use" with a button inside a red button (box) stating "NEXT". The court ultimately found that neither of these screens created a binding agreement with the consumer users of the website. First, the court noted the difference in size between the "SIGN IN" button and the hyperlink to the "terms of use" on the first screen and held:

> "[t]he importance of the "terms of use" was obscured by the physical manifestation of assent, in this case clicking the "SIGN IN" button, expected of a consumer seeking to purchase in-flight Wi-Fi. Once Berkson clicked "SIGN IN," the "terms of use" did not appear in a new screen or in a pop-up window on the same screen. *Id.* He was not required to scroll through the contract of adhesion and its boilerplate terms in order to click "accept" or "I agree."" *Id.* at 35.

---

[1] It is clear and undisputed that the Plaintiff did not have actual knowledge of the Terms of Use. (Decl. ¶ 9-13.)

[2] The actual screen shots for the GoGo website are included in the *Berkson* opinion at *6-9.

7

The court further found that:

> Gogo did not make an effort to draw Berkson's attention to its "terms of use." The hardcopy ticket in *Carnival Cruise*[3] announced its terms by (1) using the word "contract" twice; (2) addressing the reader in all caps; (3) indicating where to find the contract; and (4) inserting the word "important" and the phrase "please read." The "terms of use" presented to Berkson, aside from assuming the consumer's knowledge of the significance of a hyperlink, had none of the precautions taken by Carnival Cruise Lines, Inc. *See Carnival Cruise*, 449 U.S. at 587, 111 S. Ct. 1522.

*Id.* at *34. Finally, the court was critical that a copy of the terms and conditions were not actually provided to the plaintiff through the mail or through email after the transaction occurred.

*Sgouros v. TransUnion Corp.*, No. 14 C 1850, 2015 WL 507584, at *7 (N.D. Ill. Feb. 5, 2015) is also instructive. The website in *Sgouros* actually had a scroll box on a pop-up screen that specifically stated in the box that these were the Terms of Use. Below the scroll box was some additional language and then a button stating: "I Accept & Continue". The court refused to find a valid browsewrap agreement stating "there is no explicit reference indicating that users should read the terms in the Window. It is unreasonable to expect users to scroll down the Window when they are not aware of a possibility of being bound by the terms in the Window."

### 1. The Design and Content of the FanDuel Website do Not Create Assent to the Terms of Use

The website design and content of the FanDuel site falls woefully short to put a reasonable consumer on notice of the terms of use or that the terms of use will be binding on the user. Rather, the entire layout of the website is designed to minimize into obscurity the terms of use so that a FanDuel user is not put on notice of the Terms of Use.

First, the home page contains a hyperlink to the "Terms of Use" at the bottom of the page, which can only be observed and accessed by scrolling down the page. This link while in slightly contrasting color to the backdrop, is inconspicuous at best. *See,*

---

[3] *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)

1    *e.g. Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d. Cir. 2002)).  Moreover,

2    the use of blue for certain language further renders the "Terms of Use" language

3    inconspicuous and the failure to put that language in blue also fails to indicate to the

4    user that the language is a hyperlink.

5            Second, the color scheme and font size used in the pop-up box is designed to

6    draw people's attention towards playing FanDuel while minimizing the terms and

7    conditions.   Indeed, "Play Now", the title of the pop-up box, is in bold text and

8    extremely large font; this is similar to the active button with "Play Now" which is also

9    in large font in the box with contrasting green color lights up like a Christmas tree.  To

10   the contrary, the "signing up" and "Terms of Use" language is in the smallest font on

11   the page and is in greyscale, which fades right into the grey background of the pop-up

12   box and is in normal, as opposed to capital letters.   And the "Terms of Use" is not

13   underlined or in contrasting color to indicate it is a hyperlink.   Moreover, the

14   minimalist font and coloring scheme for the "Terms of Use" language should also be

15   compared to other portions of the website page, including requests for promo codes or

16   "log in" which is in larger font and contrasting color.

17           Third, the only active button on the pop-up screen is "Play Now" which is very

18   different than "signing up".  In fact there is no other mention on the FanDuel website

19   related to signing up, only to "Join" (the home screen) and to "Play Now" (pop-up

20   screen).  So unlike cases that find conspicuous language: "By clicking Sign Up, you

21   are indicating that you have read and agree to the Terms of Service" (Terms of Service

22   is underlined), which is used in conjunction with a button that reads "Sign Up", e.g.

23   *Fteja v. Facebook*, 841 F.Supp. 2d 829 (S.D.N.Y 2012), the FanDuel website has the

24   opposite effect.  The Fanduel website never explains by clicking "Play Now" you are

25   signing up or by clicking "Play Now" you agree to the Terms of Use.

26           Fourth, even after a person starts playing FanDuel, the company never sends a

27   copy of the Terms of Use to a player.

28           In short, the "by signing up" language, which is in small grey font, on a grey

                                           9

1  background does not provide notice that a person is being bound by the terms and
2  conditions when they Play Now.  Further, there is no manifestation of assent.

3             **ii.  The Cases Relied Upon by the Defendant are Inapposite**

4        Defendant cites to two cases for the proposition that "[n]umerous courts
5  applying New York Law have found contractual assent in similar situations."  *See*
6  FanDuel's Memo. of Points & Auth. at p. 12:1-10.  Both of those cases are inapposite.
7  Moreover, the holdings have been criticized and should not be followed by this Court.

8        *Fteja v. Facebook*, 841 F.Supp. 2d. 829 (S.D.N.Y. 2012), discussed above, had
9  very specific language that: "By clicking Sign Up, you are indicating that you have
10  read and agree to the Terms of service."  Moreover, the active button is for the process
11  stated "Sign Up".  In this case we not only have small font lettering blending into a
12  greyscale backdrop stating: "By signing up…", but the active button reads "Play
13  Now".  *See also Crawford v. Beachbody, LLC*, No. 14 CV 1583-GPC KSC, 2014 WL
14  6606563, at *3 (S.D. Cal. Nov. 5, 2014) ("By clicking Place Order below, you are
15  agreeing that you have read and understand the Beachbody Purchase Terms and
16  Conditions, and Team Beachbody Terms and Conditions" immediately above the
17  PLACE ORDER, binds internet users to the Terms and Conditions".).

18        Likewise, in *Stark v. Gilt Group, Inc.*, No. 13 Civ. 5497 LLS, 2014 WL
19  1652225 (S.D.N.Y. Apr. 24, 2014), the Plaintiff is confronted with a pop-up with a
20  "Sign Up" box which states that the consumer will become a Gilt member and agrees
21  to be bound by the 'Terms of Membership' (P. Opp. Pp. 7-8) and "By joining Gilt
22  through email or Facebook sign up, you agree to the *Terms of Membership* for all Gilt
23  Group sites."  *Stark* at *1.  This case is different.  First, the use of the small grey font
24  on the grey background does not put one on notice that they will be bound to the
25  "terms and conditions".  The location of the *Gilt* pop-up box was also significantly
26  closer to the active buttons so that it is easier to say that by pushing the buttons is
27  assenting to the terms and conditions.  Finally, the terms of use on the FanDuel site are
28  linked to "signing up" a concept that does not appear anywhere on the FanDuel

website, and a concept that the Plaintiff never clicks in agreement. These distinctions are significant and render assent by implication unavailable in this case.

The rulings in the above referenced cases have also been criticized in *Berkson v. Gogo LLC*, No. 14-CV-1199, 2015 WL 1600755, at *3 (E.D.N.Y. Apr. 9, 2015):

> *Fteja* and the lower court cases that follow its lead, mischaracterize important Supreme Court and Court of Appeals precedent regarding contracts and the reasonable person standard that must be applied to inquiry notice of, and manifestation of assent to, the terms in a contract of adhesion. The offeror must show that a reasonable person in the position of the consumer would have known about what he was assenting to…There are signficiant differences between a hyperlink available near a sign-in button, which is never subsequently mailed in hardcopy or softcopy to a consumer, as is the case here, and a hardcopy cruise ticket saying in all caps, "SUBJECT TO CONDITIONS OF CONTRACT ON LAST PAGES IMPORTANT! PLEASE READ CONTRACT ON LAST PAGES 1, 2, 3." *Carnival Cruise*, 499 U.S. at 587, 111 S. Ct. 1522.

Like *Berkson*, this Court should find that the type of website design and content used in this case does not manifest the requisite intent to bind the Plaintiff to the Terms of Use.

## II.   FanDuel Should Not be Able to Benefit Through its Deceit and Small Print

It is clear that FanDuel is a company that operates in the shadows. It not only has developed a marketing strategy that is fraudulent and deceitful, it also conducts its business with its customers in a clandestine way. Buried deep in its terms of use that are barely visible through use of the website, FanDuel not only puts in the fine print language that totally contradicts its marketing campaign, but also contains an arbitration clause and class action waiver that is clearly designed to prevent the meaningful access for a customer to seek redress.[4]

---

[4] Recently the Consumer Finance Protection Bureau did a study on the scope and use of arbitration in financial contracts. The statistics are staggering. First, over 80 million Americans have arbitration clauses in their contracts and for all those persons only 8 consumer arbitrations were filed for claims under $1,000 per year. To contract, over 32 million Americans were entitled to relief through class action settlements each year. The Bureau also determined that "[b]y design, arbitration clauses can be used to block class actions in court." http://files.consumerfinance.gov/f/201503_cfpb_factsheet_arbitration-study.pdf. In short, it is no

11

1    In this case, FanDuel was given an option when it set up its website.  It could

2    have set up a click wrap agreement to ensure that the user would have been presented

3    with the terms of use, been given a realistic opportunity to review the terms of use,

4    were encouraged to read the terms of use and then click a box that the user, after

5    reviewing the terms and conditions assents to those conditions.  FanDuel chose not to

6    do this on its website.[5]

7    Even if it used a browsewrap agreement, it could have put the terms, which were

8    in small font at least as large as the rest of the language in the pop-up box or as big as

9    the active button.  It could have put "Terms of Use" in a different color and underlined

10   it so persons would know it was a hyperlink.  It could also have used the phrase that:

11   "by clicking "Play Now" you are acknowledging that you have read and agree to the

12   Terms of Use", as opposed to using language unrelated to the active button.

13   Instead, FanDuel made the conscious decision to create and design a website

14   with a pop-up box highlighting the term "Play Now", and again in very small print, in

15   color that fades into the background is certain language that FanDuel wants to rely

16   upon to rid itself of this class action lawsuit and operate with impunity.

17   There is a reason why courts are skeptical of these agreements and why the onus

18   is on the website designer to design its website to ensure not only notice but some form

19   of affirmative assent.  It is because of the potential for abuse by these website hosts.  At

20   the very least website companies must actually try to notify its users.  Rather than to go

21   through the motions in the hopes of obtaining some type of judicial safety net for its

22   actions.

23   ///

24   ///

25   ///

26   _____

27   surprise that FanDuel has an arbitration clause in the boilerplate language tucked in obscurity on its website.  FanDuel wants to be able to mislead the public knowing full well that only 0.00002% (1 out of every 4 million) consumers may act to protect their rights through arbitration.

28   [5] To the contrary, FanDuel's mobile application is a clickwrap agreement.

12

## **CONCLUSION**

For the foregoing reasons, FanDuel's motion to compel arbitration should be denied in its entirety.

Respectfully submitted,

MILSTEIN ADELMAN, LLP

Dated:  June 11, 2015

/s/ Mark A. Milstein_____
Mark A. Milstein
Attorney for Plaintiff

Respectfully submitted,

FLAHERTY HENNESSY, LLP

Dated:  June 11, 2015

/s/ Sarah L. Gough_____
Sarah L. Gough
Attorney for Plaintiff

Respectfully submitted,

ZEBERSKY PAYNE, LLP

Dated:  June 11, 2015

/s/ Edward H. Zebersky_____
Edward H. Zebersky
Attorney for Plaintiff